UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARY B. SPAULDING and
SANDY E. SPAULDING,

                          Plaintiffs,

          - v. -

MONSANTO COMPANY,
PHARMACIA CORPORATION,
FLEXSYS AMERICA CO.,
FLEXSYS AMERICA L.P., and
SOLUTIA, INC.,

                          Defendants.

**MEMORANDUM OPINION &**
**ORDER**

09 Civ. 09470 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

          In this action, Plaintiffs assert claims under West Virginia law for injuries

allegedly caused by Monsanto's negligent waste disposal practices at its Nitro, West Virginia

chemical plant between 1949 and 1970.  (Cmplt. ¶¶ 1-5)  Plaintiffs allege that Monsanto engaged

in these negligent waste disposal practices in the course of manufacturing 2,4,5-

trichlorophenoxyacacidic acid ("2,4,5-T"), an herbicide, and that its negligence resulted in

Plaintiffs' exposure to harmful chemicals referred to as "dioxins/furans."  (Cmplt. ¶ 4)

Defendants have moved for partial summary judgment, arguing that they are entitled to prevail

under the government contractor defense as to all claims arising from 2,4,5-T production and

associated disposal practices occurring between 1963 and 1970.  For the reasons set forth below,

Defendants' motion will be DENIED.

## BACKGROUND

Defendants are Monsanto Company and alleged successors to its liabilities.[1]

Plaintiffs are "resident[s] and/or former resident[s] of Nitro, West Virginia," in which Monsanto operated a chemical plant from approximately 1934 to 2000.  (Cmplt. ¶¶ 3-4)  Plaintiff Mary Spaulding claims that she suffers from peripheral neuropathy "as a result of [Defendants'] waste disposal and waste management practices related to [2,4,5-T]."  (Cmplt. ¶ 5)  The Complaint asserts that Monsanto "adopted an unlawful practice of disposing of dioxin waste materials by a continuous process of open 'pit' burning."  (Cmplt. ¶ 74)  Plaintiffs also allege that after 1970, when the plant stopped producing 2,4,5-T, Defendants "failed to adequately control the dioxin contaminated soils and other dioxin contaminated waste materials both on and off the plant site." (Cmplt. ¶ 75)

## I.  GOVERNMENT SUPERVISION OF THE 2,4,5-T MANUFACTURING PROCESS

Defendants' government contractor defense is based on Monsanto's involvement in producing "Agent Orange," the military defoliant.  Beginning in the 1950s and continuing through 1970, Monsanto devoted a portion of its 2,4,5-T production at the Nitro plant to the needs of the United States Government.[2]   (Def. R. 56.1 Stmt. ¶ 11) The Government's demand for 2,4,5-T peaked during the Vietnam conflict, when the compound was used in Agent Orange. (Def. R. 56.1 Stmt. ¶¶ 2, 6-7)  Indeed, from at least March 24, 1967 through March 25, 1968, the

---

[1] The question of whether the alleged successors are properly named as defendants is not raised in the pending motion.  Accordingly, for purposes of this motion, this Court assumes that all defendants are properly named.

[2] To the extent that this Court relies on facts drawn from the parties' Local Rule 56.1 statements, it has done so because the opposing party either does not dispute those facts or has not done so with citations to admissible evidence.  See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted).

Nitro plant produced 2,4,5-T exclusively for the Government's use in Agent Orange.  (Def. R. 56.1 Stmt. ¶ 7)  During this period, Monsanto was not permitted to manufacture 2,4,5-T for customers other than the Government absent the Government's express permission.  (Def. R. 56.1 Stmt. ¶ 8)  Monsanto was also forced to redesign its 2,4,5-T manufacturing process in order to meet the growing demand for 2,4,5-T during the Vietnam conflict.  (Def. R. 56.1 Stmt. ¶¶ 16-17)

While the above facts are either undisputed or have not been disputed with citations to the record, Plaintiffs have offered evidence challenging Defendants' representation that all 2,4,5-T production during the period from 1963 to 1969 was undertaken "pursuant to a series of government contracts" and pursuant to government specifications.  (Def. R. 56.1 Stmt. ¶ 5)  In a 1968 Purchase Description referencing the Government's purchase of Agent Orange, for example, Monsanto and the Government specify that the agreement will "deal with the composition of the finished product and not go into the quality control of the materials used in producing [Agent] Orange."  (Rubin Decl., Ex. A)  Plaintiffs also note that Monsanto's internal documents describe the manufactured 2,4,5-T – and a related chemical, 2,4,5-D – as "two mixed, widely sold, products" which require no modification for use in Agent Orange.  (Rubin Decl., Ex. B)

## II.   GOVERNMENT SUPERVISION OF WASTE DISPOSAL PRACTICES

Because the instant case concerns injuries allegedly arising out of Monsanto's waste disposal practices at the Nitro plant, the extent of the U.S. Government's supervision of those activities is a critical issue.  Both sides cite to Monsanto's Technical Services Department's annual reports for their assertions about the U.S. Government's involvement in the Nitro plant's waste disposal practices.

3

Defendants' garbled account of the 1962 annual report states

. . . as per United States Public Health Service ("USPHS") in conjunction with the West Virginia Water Resources Division to reduce industrial waste by a total of 80% by 1965, Monsanto's "Major Objectives" at the Nitro Plant included advances in waste treatment and waste reduction, while at the same time undertaking "2,4,5-T Expansion" to meet the federal government's demands.

(Def. R. 56.1. Stmt. ¶ 21)  Defendants further allege that "Monsanto's Nitro Plant was engaged in 'close follow up and participation [in] . . . both State and Federal pollution programs,'" and that "[i]n 1963, as Monsanto began to ramp up its 2,4,5,-T operation to meet the federal government's wartime demands,  the federal government's monitoring of waste discharge in the Kanawha River region increased significantly."  (Def. R. 56.1 Stmt. ¶¶ 22-23)

The 1962 annual report states that one of Technical Services' "1963 Major Objectives" is to "assist Organic Engineering [to] develop and demonstrate a pilot treatment unit in preparation for a second major mandatory reduction in waste discharge."  (Tyrrell Decl., Ex. 26)  In the section of the report devoted to waste reduction, Technical Services explains that "[t]he West Virginia Water Resources Division will put into effect in June 1963 the first phase of [its] program to reduce industrial pollution of the Kanawha River . . . , [which] will require that Monsanto as well as other industries reduce their plant waste by 40%."  (Id.)  The report further states that "friction has developed between the USPHS and ORSANCO [the Ohio River Valley Sanitation Commission]," reflecting a "battle between those who are in favor of Federal government control of pollution and those who favor regional or state control."  "This fight appears to be centering on the Kanawha River as it is probably the most polluted stream under ORSANCO control.  The USPHS seems to be trying to embarrass ORSANCO over condition[s] on the Kanawha River."  (Id.)  The report further states that "an unpublished memorandum of the

[West Virginia] Water Resources Division indicates their plans to require another 40% or a total of 80% reduction of industrial waste by the end of 1965." (Id.)

The 1963 Technical Services report's remarks concerning waste management are similarly focused on water pollution in the Kanawha River.  The report states that Monsanto's waste reduction programs for 1962 and 1963 have had the "effect . . . [of] reduc[ing] [Monsanto's waste] to the new 40% permit level for the month prior to the deadline required by the Water Resources Division."  (Tyrrell Decl., Ex. 27)  The report also states that Technical Services' "1963 waste abatement activities involved . . . in-plant abatement studies to develop means of waste incineration."  (Id.)

The 1963 annual report also discusses federal government involvement in monitoring pollution in the Kanawha River:

> Federal activity in water pollution study of the Kanawha River increased significantly in 1963.  The USPHS started an intensive survey of the Kanawha River in the summer of 1963.  There was fear that this would develop into a Federal hearing over the polluted condition of the Kanawha River and thus interject the Federal Government into this problem.  A conference between U.S. Senator Randolph, local Plant Managers, and USPHS officials tended to ease this fear and remove USPHS pressure in this area.

(Id.)

With respect to air pollution, the 1963 annual report states that "[l]ittle emphasis had been placed on air pollution by public authorities until late in 1963," but notes that "[a] citizens group, headed by a State Senator, started a movement to bring air pollution problems to the forefront," and that "[a]n announcement was made in December that the USPHS would conduct an Air Pollution Survey in the Kanawha Valley during the summer of 1964."  (Id.)

5

Technical Services' 1964 annual report includes what appear to be headlines from news articles indicating that government authorities have embarked on a study of air pollution in the Kanawha Valley.  (Tyrrell Decl., Ex. 28)  The report states that

> [t]he United States Public Health Service and the West Virginia Air Pollution Commission have started on [an] extensive air pollution study of the Kanawha Valley.  This is one of three surveys of this magnitude now being sponsored by the PHS.  A complete audit of emissions from every process in the plant has been made and will be given to the air pollution team.  Increased Federal and State expenditures for air pollution control will result in more and more pressure being applied to industries to reduce air pollution.

(Id.)

> The 1965 annual report states that

> [t]he Nitro Plant is again faced with drastic reduction in waste load.  The Division of Water Resources will require a 50 percent reduction in waste load by June 1966.  This will be met by in-plant reductions and by installation of a $130,000, 1.4 million gallon aerated lagoon.

> Political forces continue to be active in 1965.  The U.S. Public Health Service continues to monitor water quality in the Kanawha River with the threat that they will become active in enforcement pr[og]rams.  The Nitro Plant was visited in October by Messrs. Ellenger, Roes, and Venderhof of the USPHS Taft Sanitary Engineering Center.  The purpose of this visit was for review of progress being made by local chemical industries in abating waste.  A Kanawha River inspection trip was held by ORSANCO to publicize progress made in improving conditions of the Kanawha River.  This was made in an effort to forestall federal take-over of the pollution control of the Kanawha River.

(Tyrrell Decl., Ex. 30)

Technical Services 1967 annual report contains the following remarks about government authorities' air pollution program:

> The air pollution program in the Kanawha Valley is in the formative stages with increased activity expected during 1968.  An air pollution survey sponsored by the United States Public Health Service is near completion.  Four regulations have been adopted, two of which – fly ash and odor regulation [– ] have a direct effect on our operation.  Improved fly ash collection equipment has been installed on one of our two coal burners and is now being evaluated, with modifications to be

6

made to the other boiler in 1968.  Odor problems at the Nitro Plant are being
defined.  $SO_2$ and H2S em[]issions are a problem that will receive additional
attention in 1968.

(Tyrrell Decl., Ex. 29)

## PROCEDURAL HISTORY

Plaintiffs filed this action in October 2009 in Supreme Court of the State of New

York, New York County.  (Dkt. No. 1 (Notice of Removal) ¶ 1)  On November 13, 2009,

Defendants removed the case to this Court pursuant to (1) 28 U.S.C. § 1442(a)(1), on the

grounds that they were entitled to assert the federal government contractor defense; and (2) 28

U.S.C. § 1332, on the grounds that there was complete diversity between the parties.  (Dkt. No. 1

(Notice of Removal) ¶¶ 6, 19)

On December 22, 2009, Defendant Monsanto – with the consent of the other

defendants -- moved to transfer this case to a pending multidistrict litigation (MDL-381), noting

that the Plaintiffs "allege[d] injury and property damage from exposure to dioxin purportedly

generated during the manufacture of Agent Orange."  (Dkt. No. 13, Ex. A(1), at 2, 2 n.2)

Monsanto argued that this case has common issues of fact with MDL-381, which involves

numerous cases arising "from the exposure of servicemen and others to Agent Orange, a toxic

herbicide used as a defoliant in Vietnam during the Vietnam war," and plaintiffs who "include[]

veterans, both American and foreign, their family members and civilians."  (Tyrrell Decl., Ex. 32

(Order Denying Transfer) at 1)

On April 2, 2010, the United States Judicial Panel on Multidistrict Litigation

denied Monsanto's motion to transfer.  The Panel was "not persuaded that any factual questions

[this case] may share with the actions previously centralized in MDL No. 381 are sufficient to

warrant transfer, especially given the unique nature of this docket and its current status."

(Tyrrell Decl., Ex. 32 (Order Denying Transfer) at 1)

## DISCUSSION

Defendants argue that their motion for partial summary judgment must be granted, because the Second Circuit has previously held that "Monsanto is entitled to the protection of the government contractor defense against allegations of injury from exposure to the dioxin generated by the manufacture of 2,4,5-T used in Agent Orange."  (Def. Br. 17) Defendants assert that "no genuine issue of material fact exists with regard to [their] entitlement to the government contractor defense for at least a portion of the dioxins/furans to which the Plaintiffs claim exposure."  (Id.)

## I.      LEGAL STANDARD

Summary judgment is appropriate only when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Whether facts are material is a determination made by looking to substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "A dispute about a genuine issue exists" where "the evidence is such that a reasonable jury could decide in the non-movant's favor."  Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (internal quotation marks omitted).  Courts "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment."  Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001).

Here, Defendants have moved for summary judgment on the issue of whether the government contractor defense applies.  Because Defendants would have the burden of proof on

8

this issue at trial, see Zinck v. ITT Corp., 690 F. Supp. 1331, 1338 (S.D.N.Y. 1988), they have

the burden of demonstrating now that there is no issue of material fact as to their ability to

prevail on this defense.

## II.     THE GOVERNMENT CONTRACTOR DEFENSE

In Boyle v. United Techs. Corp., 487 U.S. 500 (1988), the Supreme Court

considered whether federal common law preempted a state-law wrongful death suit against a

government contractor that had manufactured a military aircraft with an alleged safety defect.

The Court noted that "a few areas, involving 'uniquely federal interests,' are so committed by the

Constitution and laws of the United States to federal control that state law is pre-empted and

replaced, where necessary, by federal law of a content prescribed (absent explicit statutory

directive) by the courts – so-called 'federal common law.'"  Boyle, 487 U.S. at 504 (internal

citations omitted).  Such displacement of state law by federal common law may, under certain

circumstances, "apply as well to the civil liabilities arising out of the performance of federal

procurement contracts."  Id. at 505-06.  "Displacement will occur [, however,] only where . . . a

'significant conflict' exists between an identifiable 'federal policy or interest and the [operation]

of state law,' or the application of state law would 'frustrate specific objectives' of federal

legislation."  Id. at 507 (internal citations omitted).

The Boyle court further explained that

> [l]iability for design defects in military equipment cannot be imposed, pursuant to
> state law, when (1) the United States approved reasonably precise specifications;
> (2) the equipment conformed to those specifications; and (3) the supplier warned
> the United States about the dangers in the use of the equipment that were known
> to the supplier but not to the United States.

Id. at 512.  The first two requirements "assure that the suit [in which immunity is claimed] is

within the area where the policy of the 'discretionary function' would be frustrated – i.e., they

assure that the design feature in question was considered by a Government officer, and not merely by the contractor itself." Id. The third requirement is necessary because "in its absence, the displacement of state tort law would create some incentive for the manufacturer to withhold knowledge of its risks, since conveying that knowledge might disrupt the contract but withholding it would produce no liability." Id.

Where a contractor follows government specifications in some respects but uses its own discretion as to others, state law will not be displaced as to the matters in which the contractor exercised discretion:

> If, for example, the United States contracts for the purchase and installation of an air conditioning- unit, specifying the cooling capacity but not the precise manner of construction, a state law imposing upon the manufacturer of such units a duty of care to include a certain safety feature would not be a duty identical to anything promised the Government, but neither would it be contrary. The contractor could comply with both its contractual obligations and the state-prescribed duty of care. No one suggests that state law would generally be pre-empted in this context.

Id. at 509.

Although the Boyle court discusses pre-emption in the context of "design defects in military equipment," the Second Circuit has applied the Boyle test in litigation arising out of the manufacture of Agent Orange. See, e.g., In re Agent Orange Prod. Liability Litig., 517 F.3d 76, 87-99 (2d Cir. 2008).

## III.    NECESSARY EXTENT OF GOVERNMENT SUPERVISION

Assuming – as this Court must for purposes of this motion – that (1) Monsanto's "open pit burning" of dioxin waste from manufacture of 2,4,5-T was negligent; and (2) that its negligent waste disposal practices caused Plaintiffs' injuries, the question is whether Defendants may properly assert the government contractor defense against Plaintiffs' claims. For purposes of Defendants' summary judgment motion, that issue turns on whether – as Defendants claim –

10

the Government "approved reasonably precise specifications" for disposal of the 2,4,5-T waste,

Boyle, 487 U.S. at 512, or whether – as Plaintiffs claim – Monsanto's practice of "open pit

burning" was not sanctioned by the federal government.

       In contending that the government contract defense requires dismissal of

Plaintiffs' claims, Defendants argue that (1) the federal government closely supervised the

disposal of 2,4,5-T waste, and thereby "approved reasonably precise specifications" for that

process (Def. Br. 33-34); (2) permitting Plaintiffs' waste disposal-based claims to proceed

defeats the purpose of the government contractor defense, which reflects "the necessity of

[contractors] 'getting the government's work done' without fear that carrying out this work will

result in tort liability" (id. at 31); and (3) courts have previously applied the government

contractor defense to claims based on waste disposal practices.  (Id. at 28-31)

       Plaintiffs counter that (1) "the government had no control, oversight or even an

interest in the waste products from the 2,4,5-T production or the method of disposing of such

waste products"; and (2) courts have applied the government contractor defense to claims based

on waste disposal practices only where there has been much more evidence of government

oversight of those practices.  (Pltf. Br. 22-24)

       In In re Agent Orange Litig., 517 F.3d 76, 93 (2d Cir. 2008), the Second Circuit

addressed the extent of government approval necessary to render the government contractor

defense applicable.  The plaintiffs in that case – "United States military veterans or their

relatives" – alleged that they were injured by exposure to dioxin found in Agent Orange.  Id. at

82.  Plaintiffs contended that the dioxin could have been virtually eliminated if the defendant

manufacturers had employed a lower-temperature manufacturing process.  Id. at 92.

Accordingly – plaintiffs contended – "the alleged defect was unrelated to the contractual

11

specifications for 2,4,5-T because it was the defendants' chosen manufacturing processes – with which the government was not involved and which were not integral to contract compliance – that caused dioxin to be present."  Id. at 89.  Because, in the instant case, Plaintiffs similarly assert that their injuries were caused by an aspect of Monsanto's operations "with which the government was not involved and [which was] not integral to contract compliance," the Second Circuit's treatment of this claim in In re Agent Orange Litig. is instructive.

The Second Circuit acknowledged that "the government harbored no preference, expressed or otherwise, regarding how the herbicides were to be produced," and that the evidence did not "establish as a matter of law that there was an inherent conflict between use of the [lower temperature manufacturing] process and compliance with defendants' contractual obligation to the government."  Id. at 94.  The Court ruled, however, that even under these circumstances the government contractor defense applies where the record reveals "considered attention by the government to the precise defect alleged," and a subsequent decision by the government to re-order the product.  Id. (citing Lewis v. Babcock Indus., Inc., 985 F.2d 83, 89 (2d Cir. 1993)).

The Court went on to hold that U.S. Government representatives had paid the requisite "considered attention" to the Agent Orange manufacturing process to trigger the government contractor defense.  In particular, the Court noted that the Army had conducted a meeting "to evaluate the toxicity of [the most toxic variant of Agent Orange]," that the meeting's purpose had been to consider "dose levels and hazards to health of men and domestic animals from 2,4-D and 2,4,5-T based on the medical literature and unpublished data of various research laboratories," and that U.S. military and government representatives had found, "after careful review of toxicological data related to 2, 4-D and 2, 4, 5-T plus the knowledge as to the manner

12

these materials have been used for defoliation in military situations in Southeast Asia, . . . that no health hazard is or was involved to men or domestic animals from the amounts or manner [in which] these materials were used . . . ."  Id. at 95.  After this evaluation of toxicological data, the Government "continued to contract with the defendants for purchase of the same and similar defoliating agents."  Id.

In sum, the Court concluded that "[t]he government made an express determination, based on the knowledge available to it at the time, that Agent Orange as then being manufactured posed no unacceptable health hazard for the wartime uses for which it was intended, and that the product  should continue to be manufactured and supplied to it."  Id. at 96-97.  Under such circumstances, "'[t]he imposition of liability under state law would constitute a significant conflict with the [g]overnment's decision' that the defoliants . . . posed no unacceptable hazard."  Id. at 95 (quoting Lewis, 985 F.2d at 89).  The Court went on to rule that the first element of the Boyle test – Government approval of "reasonably precise specifications" for the product – was met.  Id. at 95.

Here, Defendants rely on a series of annual reports prepared by the Nitro plant's Technical Services Department between 1962 and 1967 in arguing that the federal government closely supervised all of the plant's operations, including its waste disposal practices.  (See Def. R. 56.1 Stmt. ¶¶ 47-56)  The record does not demonstrate, however, that U.S. Government representatives made an "express determination" regarding Monsanto's alleged waste disposal practices, including open pit burning of dioxin waste materials.  There is likewise no evidence that federal authorities exercised consistent oversight over Monsanto's waste disposal practices.  Although the Technical Services Department's annual reports show that the USPHS made some efforts to encourage industrial waste abatement in the Kanawha River Valley region, the reports

do not establish that U.S. Government representatives supervised Monsanto's waste disposal practices, or were even aware of the alleged practice of disposing of dioxin waste through open pit burning.

The focus of the Technical Services Department's early reports is on the West Virginia Water Resources Division's efforts to reduce pollution in the Kanawha River. (See Tyrrell Decl., Exs. 26-28) These reports make clear that it is this state agency, and not the federal government, that is driving the effort to reduce pollution in the Kanawha River. To the extent that Monsanto feared federal action, the 1963 annual report indicates that the involvement of a senator "tended to ease this fear and remove USPHS pressure in this area." (Tyrrell Decl., Ex. 27) At best, the annual reports reference federal government "study" of pollution in the Kanawha River; they do not demonstrate that the federal government was actively supervising industrial waste disposal processes. (See Tyrrell Decl., Ex. 28 ("The U.S. Public Health Service continues to monitor water quality in the Kanawha River with the threat that they will become active in enforcement [programs]."); Tyrrell Decl., Ex. 30 ([Waste reduction efforts were made] in an effort to forestall federal take-over of the pollution control of the Kanawha River."))

The record is the same as to air pollution. The annual reports make reference to federal study of the problem, but do not demonstrate federal supervision of waste disposal practices. The 1964 annual report, for example, states that the "United States Public Health Service and the West Virginia Air Pollution Commission have started [an] extensive air pollution study of the Kanawha Valley," and that "[a] complete audit of [emissions] from every process in

the plant has been made and will be given to the air pollution team."[3]  (Tyrrell Decl., Ex. 28)  It appears that nothing more than study took place during the 1964 to 1967 time period, however. Indeed, the 1967 annual report states that "[t]he air pollution program in the Kanawha Valley is in the formative stages" and that the USPHS air pollution survey "is near completion."  (Tyrrell Decl., Ex. 29)  While the 1967 report states that "four regulations have been adopted, two of which – fly ash and odor regulation, have a direct effect on our operations," the report does not explain what agency issued the regulations nor is there any suggestion that the regulations were directed specifically at the Nitro plant's alleged open pit burning waste disposal practices.  (Id.) In sum, the annual reports do not establish that the federal government became aware of the Nitro plant's alleged "open pit burning" waste disposal practices, and they certainly do not demonstrate that the federal government supervised or sanctioned such practices.

Finally, Defendants offer an affidavit from Lawrence Eugene Dotson, who was employed at the Nitro plant between May 1961 and September 1969.  (Tyrrell Decl., Ex. 9, ¶ 1) Dotson states that "[d]uring the mid-1960s . . . officials were on-site at the Nitro plant for at least one week in order to familiarize themselves with the plant's operations," that "the government officials maintained an office on-site at the Nitro plant," and that he "personally showed the federal officials around Monsanto's Nitro plant, focusing on all aspects of the 2,4,5-T production process."  (Tyrrell Decl., Ex. 9, ¶ 7)  Dotson's affidavit sheds no light on the question of whether federal government officials observed, supervised, or sanctioned Monsanto's open pit burning waste disposal practices at its Nitro plant.

---

[3]   It is not clear whether the "air pollution team" referenced in the 1964 annual report is made up of Monsanto employees at the Nitro plant or government officials from the USPHS, the West Virginia Air Pollution Commission, and the Ohio River Valley Sanitation Commission.

15

Defendants have not offered sufficient evidence for this Court to conclude, as a matter of law, that the U.S. Government ever made an express determination that Monsanto's waste disposal practices – including its alleged practice of "open pit burning" – did not pose a safety hazard.  In In re Agent Orange Litig., discussed above, the Second Circuit upheld the district court's finding of such an "express determination," because the "government [had] explicitly evaluated the alleged design defect (toxic 2, 4, 5-T)," concluded that Agent Orange "posed no unacceptable hazard," and "thereafter continued to order 'replacement' herbicides." In re Agent Orange Litig., 517 F.3d at 94-95.  Here, there is no evidence that the U.S. Government was ever aware of the alleged open pit burning practice, much less that it had evaluated the hazard posed by such a practice.

Because Defendants have not demonstrated that the complained-of activity – the open pit burning of dioxin waste at the Nitro plant – was conducted "pursuant to reasonably precise government specifications," their motion for summary judgment based on the government contractor defense must be denied.[4]

---

[4] Hansen v. Dow Chem. Co., 2009 WL 3242305, at *1 (E.D.N.Y. Oct. 9, 2009) and Depascale v. Sylvania Electric Prods., Inc., 710 F. Supp. 2d 275 (E.D.N.Y. 2010), are not to the contrary.  In Hansen, plaintiffs claimed that Agent Orange manufactured by the defendants had leaked from improperly stored barrels, causing them injury.  The court granted summary judgment to the defendant manufacturers on their government contractor defense.  The court noted that the Agent Orange at issue had been delivered by the defendant manufacturers to the government "more than a third of a century ago."  "The barrels have been stored on government land and tended to by agents of the government since delivery."  In "a government storage area, [the barrels had] been subject to corrosion by salt in sea-air, and possibly by their contents," resulting in leakage. Hansen, 2009 WL 3242305, at * 1.  While in Hansen the federal government was intimately involved in the storage procedures that led to the leakage of Agent Orange and plaintiffs' alleged injuries, here, by contrast, Defendants have not demonstrated that the government was involved in any fashion in the open pit waste disposal practices or that it approved those practices.

In Depascale, the court considered negligence claims arising from a government contractor's alleged "improper disposal of cleaning solvents or other chemicals."  710 F.Supp.2d at 284.  The

16

## **CONCLUSION**

For the reasons stated above, Defendants' motion for partial summary judgment

(Dkt. No. 30) is DENIED. The Clerk of the Court is directed to terminate the motion.

Dated: New York, New York
       September 28, 2011                SO ORDERED.

                                         *Paul Gardephe*

                                         Paul G. Gardephe
                                         United States District Judge

---

issue in Depascale, however, was not whether the Government had imposed "reasonably precise specifications" relating to the disposal of cleaning solvents, but rather whether the defendants' disposal practices had complied with those specifications. There was no question in Depascale that the defendants had presented sufficient evidence of "reasonably precise specifications" from the Government regarding disposal of cleaning solvents. See id. at 282-83 (summarizing testimony establishing that defendants' contract with the Atomic Energy Commission "controlled all aspects of the work to be performed, including waste disposal," and that "use of the disposal sump at the Site was discussed with AEC personnel and that its use was an 'appropriate technique and approved by the AEC"). Because the question of whether the Government had given "reasonably precise specifications" concerning waste disposal was not at issue in Depascale, the case has no application here.

Finally, Defendants' argument that claims related to design defect and claims related to waste disposal cannot be separated for purposes of the government contractor defense has been rejected. See Anderson v. Hackett, 646 F. Supp. 2d 1041, 1054 (S.D. Ill. 2009) (rejecting removal based on government contractor defense; "[p]laintiffs' claims arise from the handling, storage, and disposal of Defendants' products, including Agent Orange," and defendants "have not directed this Court to any evidence suggesting that the federal government directed them to act in any of the ways alleged by Plaintiffs to have caused them harm"); Carter v. Monsanto Co., 635 F. Supp. 2d 479, 495 n.11 (S.D. W.Va. 2009) (rejecting removal based on government contractor defense; although the defendant had produced 2,4,5-T pursuant to government specifications, there was "no causal nexus between the defendants' production and distribution of 2,4,5-T . . . and the defendants' disposal of 2,4,5-T waste at the Manila Creek dump site").

17